BENCH CANAL CO. v. E. J. SULLIVAN

(No. 1504; Oct. 30, 1928; 271 Pac. 221)

346

*Brome & Brome* of Basin, for appellant.

*Ernest J. Goppert,* for respondent.

RINER, Justice.

This is a proceeding by direct appeal from a decree of the District Court of Big Horn County, adjudging a lien in favor of respondent for certain alleged delinquent assessments for irrigation system maintenance and operative charges upon sundry unsold water right contracts held by appellant for the irrigation of certain lands and their proportionate interests in the irrigation system operated by respondent. The decree also foreclosed the lien and directed a sale of the property to satisfy the same. The record discloses in substance the facts recited below.

The "Burlington" or "Bench" canal and irrigation system was originally constructed by the Big Horn Basin Development Company—hereinafter, for convenience, designated the "construction company"—pursuant to certain contracts entered into between it and the State of Wyoming, for the purpose of enabling said company to sell water rights for proportionate interests in its irrigation system to settlers upon various lands designated in such contracts. The project was initiated and administered under the legislation of this state, enacted to meet the requirements of the well known federal Carey Act relative to arid lands in western states.

The first of these contracts, of date September 29, 1896, contained the following provision, relative to the rights and obligations of the construction company and the purchasers of water contracts from it, upon the latter being vested with title, control and management of the irrigation system :

"Said Party of the Second Part (The Big Horn Basin Development Company) agrees to maintain and operate said canal until it shall have sold shares in said canal embracing ninety (90) per cent of the land herein described, susceptible of irrigation and reclamation, when it agrees to convey to the purchasers of shares in said canal, without further consideration than the consideration stipulated for in the contract of purchase, the shares contracted for and the control and management of said canal, together with all the rights and franchises thereto belonging, and to transfer said canal to such owners and holders of shares in good order and unencumbered; provided that said transfer may be made before the number of shares aforesaid in said canal have been sold, if the said Party of the Second Part so elects; but when said transfer shall be made, the said Party of the Second Part shall elect to donate or transfer, without further cost, to the owners and holders of shares in said canal, as aforesaid, all its unsold shares therein, or to retain such unsold shares, or any portion of them, on which shares so retained it shall be liable to assessment for the maintenance, repairs and superintendence of said canal to whatever proportionate amount the number of shares so retained bears to the whole number of shares in said canal."

The second contract, dated September 24, 1904, while covering some of the land mentioned in the first agreement, embraced a larger amount of other lands. It makes mention of previous dealings of the construction company with the State, relative to the selection by the latter of desert lands for reclamation pursuant to the act of Congress already mentioned, but does not, however, specifically refer to the contract of September 29, 1896. Concerning the subject with which the quoted clause of the earlier agreement deals, it provides that the construction company shall retain the control and management of the proposed irrigation system until ninety per cent of the water right contracts have been sold, and then:

"upon fully completing the sale, transfer and conveyance, as aforesaid, of such ninety per cent. interest in said system to said settlers, the said party of the second part will and shall relinquish to said settlers the control, direction

and management of said system, and thereafter the same shall be exercised by such settlers in such manner as they shall deem proper, and said ninety per cent. interest in said system shall be held, owned and possessed by said settlers free and clear of any and all liens, charges or incumbrances which may have been placed thereon by said party of the second part.''

Another contract between the State and the construction company was entered into on February 9, 1907, which included some of the lands mentioned in the second, but none of those described in the first contract, and was for the purpose of providing for the irrigation thereof from another source of supply, viz. the Greybull river. This contract definitely mentions the preceding agreement of September 24, 1904, and also embodies a clause similar to the one quoted above from that contract. Both of the agreements last mentioned declare that the construction company may insert in its contracts with purchasers of water rights, additional conditions and covenants as may be deemed advisable, not, however, contrary to law or the terms of these contracts.

After performing considerable work upon the contemplated irrigation project, the construction company became financially embarrassed, and its rights, under all the several agreements with the State, ultimately passed to certain trustees acting on behalf of its bond-holding creditors. Thereafter the respondent, having been incorporated for the purpose of taking over this particular property, these trustees, on January 6, 1912, conveyed to it all the right, title and interest held by them in the Bench Canal and certain water rights appertaining thereto. The instrument of conveyance, however, reserved to the trustees, their successors and assigns, ''the rights to contract with others, water for all the lands that are susceptible of irrigation from the Bench Canal and described in the water permits'' thus transferred. Finally, through conveyance and foreclosure proceedings—not here necessary to state in detail—these

reserved rights were, on July 23, 1921, purchased by appellant.

After respondent had in this manner received the title to the Bench Canal and the water rights which served it, it assumed necessarily its management and operation, which heretofore had been vested in the construction company and the trustees aforesaid. Yearly assessments for accruing maintenance and operating charges of the irrigation system were by it ordered and levied proportionately upon the lands of all those holding water right contracts thereunder, including as well those of the unsold water right contracts, which, as we have seen, came finally to be owned by appellant. These assessments were imposed by respondent during the years 1914 to 1925, both inclusive. It would seem that before the present controversy arose, one of the appellant's predecessors in interest and also appellant himself, made some payments which would appear to be on account of certain of these assessments on some of the unsold water right contracts here involved, though there is dispute about this. Most of such assessment charges, with the accruing interest thereon, however, were never paid.

It was and is claimed for respondent that for the several yearly maintenance and operative charges made necessary to keep the irrigation system going, it has a lien upon the unsold water right contracts of appellant, carrying with them as they do proportionate interests in the irrigation system owned and operated by respondent. This is really the only question argued and submitted for our determination. The District Court reached an affirmative conclusion concerning this proposition and, as heretofore indicated, decreed a lien upon the interests thus held by appellant, and ordered its foreclosure and sale to satisfy the same.

In 1909, the Legislature of this state enacted the law which became Chapter 160 of the Session Laws for that year. Section 5 of the chapter authorized companies, associations or corporations operating or controlling irrigation systems, to levy and collect "such reasonable and necessary

assessments for the cost of operation, maintenance and repairs" of such systems as might be duly ordered by their membership, and it was further provided in the law that:

"Such companies, associations and corporations shall have a lien on the proportionate interests in such reservoirs, irrigation systems and ditches, and upon the lands described in contracts for or deeds to such proportionate interests for the amount of any unpaid assessments which may be enforced in a court of competent jurisdiction, as in the case of other liens."

The law remained in this form until 1917, when it was amended, as to the clause above quoted (Laws of 1917, C. 55), thus:

"Such companies, associations and corporations shall have a lien upon the proportionate interest in such reservoirs, irrigation systems and ditches, shall become a first lien upon the lands deeded or described in contracts for or deeds to such proportionate interests for the amount of any unpaid assessments which may be enforced in a court of competent jurisdiction, as in the case of other liens."

The statute still retains this language, though it is plain that the word "which" must be interposed before the word "shall" in the clause, in order to make the remainder thereof grammatical and sensible. It is generally held to be permissible in the construction of statutes to supply a word which obviously has been inadvertently omitted and which is necessary to complete the sense and express the legislative intent, though, of course, such insertion must be exercised with care. Southerland Statutory Construction, Sec. 260; 25 R. C. L. 976; 36 Cyc. 1127; In Re Segregation of School District, 34 Idaho 222, 200 Pac. 138; Commonwealth v. Florence, 192 Ky. 236; 232 S. W. 369; State ex rel. Tadlock v. Mooneyham, 212 Mo. App. 573, 253 S. W. 1098; Harris v. Grayson, 90 Okla. 147, 216 Pac. 446; Johnson v. Baker, 149 Tenn. 613, 259 S.

W. 909; Southern Railway Co. v. Rowland, 152 Tenn. 243, 276 S. W. 638; Winter v. Hindin, (Del.) 136 Atl. 280.

For appellant it is said that these provisions of law gave the construction company (and, of course, its successors in interest) only a lien upon land where a contract of sale has been made, the land entered and the purchaser fails to pay the balance due for the purchase of the water right, as provided by his contract. But the language of both the act of 1909 and that of 1917, as severally quoted above, is, we think, broader and more comprehensive in it scope than as thus urged, and deals besides with maintenance and repair charges and not with the matter of the collection of the original purchase price of the water rights sold. Plainly, a lien is by both laws given to such companies "upon the proportionate interest in such reservoirs, irrigation systems and ditches." In our opinion, this language can and does apply just as definitely to the interest represented by unsold water contracts held by the construction company and its successors in title thereto, as to the interests represented by those contracts, when they have been disposed of to settlers and the lands covered by them have been undertaken to be reclaimed.

It will be remembered from what has been recited above, that the construction company, under its first contract with the State, agreed, when the management and control of the irrigation system was turned over to the purchasers of water right contracts from it, either to donate to them the unsold water right contracts relative to the system thus transferred, or to stand responsible for current maintenance charges proportionate to the lands embraced in such contracts, should such unsold water right contracts be retained by it. While no lien was in terms granted by the language of that first agreement with the State on account of the obligation imposed, it was, nevertheless, one which could have been undoubtedly enforced against the construction company. The equity of the provision is apparent, for if the construction company retained a right to sell interests in

the irrigation system transferred to the water users, that right would only remain of consequence so long as the system was maintained and kept in repair. In short, if such charges were not met, both the sold and the unsold water right contracts would speedily become valueless. The holders of the contracts for water rights purchased from the construction company and its successors who had entered upon the lands for reclamation, were of necessity obliged to see to it that maintenance and repair charges on the system were promptly liquidated, if their efforts and property were to be in any wise preserved. It is difficult to understand why the holder of an unsold water right contract, with its proportionate interest in the irrigation system, should not likewise promptly attend to the protection of his property. Doubtless such considerations as these, influenced the Legislature to employ the broad language it did in providing for a lien upon such property. In this connection, it may be observed, that most of these contracts with the State empowered the construction company, so long as it remained in control of the irrigation system, to have the maintenance and operating charges thereof incurred by it protected by lien upon the ''entered lands and upon all water rights'' therefor of those to whom it had sold its water right contracts.

If appellant, instead of holding for sale the rights vested in him relative to the irrigation system brought into existence through the efforts of the construction company, had decided to use them himself and reclaim the land, obviously no good reason could be advanced, under the statutory provisions above mentioned or the contracts which created such rights, why his property should then be excused from meeting the maintenance and repair charges upon the ditches which would carry the water which would enable him to reclaim his land. It is hard to perceive why his proportionate interest in the irrigation system should be excused from meeting these charges, merely because he determined to allow the rights owned by him to remain idle

and unused, their value being added to, or at least constantly maintained yearly, by the contributions of others who are active under their contracts in bringing about the reclamation of their lands.

The latter part of the clause quoted, supra, from the 1909 and 1917 enactments, appears to deal with the matter of fastening a lien upon the land itself. Just why the Legislature made the change in the law in 1917 is not altogether clear, although it may have been with the idea of preventing a lien from being imposed upon the land before any contracts for water rights and its reclamation were sold. In the instant case the point is beside the question before us.

No other state, so far as our attention has been directed by counsel, and so far as we have been able to find from our own research in the laws of the western states where Carey Act legislation prevails, appears to have a statute in phraseology similar to the legislation we are now considering. Several, however, have statutes giving a lien for maintenance charges. The case of Brown v. Portneuf etc. Irrigation Co., 5 Fed. (2d) 895, affirmed in 47 Sup. Ct. Rep. 692, cited by appellant, is not in point here, for it involved a law of the state of Idaho giving to companies, persons or associations furnishing water for land, a first lien on a water right and land on which the water is used for all deferred payments for such water right. The only question for decision was whether that lien was superior to the lien of assessments made by an operating company for the expense of maintaining and operating the irrigation system—an inquiry foreign to the case at bar.

In our judgment the decree of the District Court was correct, and should be affirmed.

*Affirmed.*

BLUME, C. J., and KIMBALL, J., concur.